```
            UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF WEST VIRGINIA
                    AT CHARLESTON
```

**LATISHA DOTSON**

       Plaintiff

v.                                           Civil Action No. 2:06-1041

**WELLS FARGO BANK, N.A.,**
individually and as
successor in interest to
**WELLS FARGO HOME MORTGAGE, INC.**

       Defendant


## MEMORANDUM OPINION AND ORDER

Pending is plaintiff Latisha Dotson's motion for a temporary restraining order, filed December 15, 2006.

On December 19, 2006, came the plaintiff, in person and by counsel, Bren J. Pomponio, and came the defendant Wells Fargo Bank, N.A. ("Wells Fargo"), by counsel, Debra Lee Hovatter, for an evidentiary hearing.

I.

On December 19, 2003, Dotson purchased a home located in Morrisvale, West Virginia ("the property"). She obtained the property, in part, with a loan from Wells Fargo Home Mortgage, Inc. ("WFHMI"), in the amount of $39,644. WFHMI is a subsidiary

of Wells Fargo.  According to a note executed by Dotson on December 19, 2003, her monthly payment obligation was $308.35.  The sum covered only principal and interest.  Dotson agreed to secure hazard insurance and pay her real estate taxes without resort to escrow.

Dotson became delinquent in her payment obligations at various times beginning in July 2005.  In October 2005, she brought her account current through that month with a payment of $1,650.  Dotson became delinquent anew, however, when she failed to send her November payment.  In December 2005 and January 2006, she made payments of $300.91 and $350.92 respectively.  It was around this period of time that Dotson's monthly payment obligation was increased to reflect escrow charges that came about as a result of her failure to, as promised, keep in place hazard insurance and cover real estate taxes on the property.  As a result of Dotson's failure, WFHMI force-placed the insurance and paid the real estate taxes through an escrow advance of approximately $1,500.  This change resulted in Dotson's monthly payment increasing to approximately $714.

On January 31, 2006, Dotson spoke with a WFHMI representative named Judy.  Dotson advised WFHMI at that time that the increased payment resulted in a hardship to her.  As a

result of the conversation, she contends an agreement was reached that reduced her monthly payment obligation. The revised payment, including escrow amounts, came to $542.97, with the first payment due on February 1, 2006.

On February 20 and March 16, 2006, Dotson made her payments as agreed in the amount of $542.97 each. Approximately two days after receiving the March payment, however, WFHMI returned that sum to Dotson. The February payment was retained. Preceding this payment return in March, Dotson was notified in writing four times by WFHMI, on December 6, 2005, January 24, 2006, February 27, 2006, and February 28, 2006, that it intended to accelerate her loan. Following the March payment, Dotson made no other payments on the loan.

On May 2, 2006, Dotson was additionally advised by certified mail, return receipt requested, that her home would be sold at public auction on May 23, 2006. The May 2, 2006, communication advised Dotson of her right "to bring a Court action to assert the non-existence of the default or any other defense . . . [she] may have to stop the acceleration of the sale." (Pl.'s ex. 5). The property was ultimately sold on May 23, 2006, to Wells Fargo according to the substitute trustee's report of sale recorded June 12, 2006. Dotson concedes she

obtained a copy of the report of sale from the courthouse, although she did not specify a date of receipt.

That fact is of little consequence, however, inasmuch as Wells Fargo sent Dotson on July 7, 2006, a certified letter giving her notice to vacate the property.  The notice explicitly advised Dotson that the property was sold at public auction on May 23, 2006.  She was further advised that if she refused to vacate, appropriate action would be taken in the Magistrate Court of Boone County.

In July 2006, Dotson purchased, and relocated her family, to a two-bedroom mobile home approximately five miles away from the property.  Dotson, who is divorced, has three children consisting of a 17-year old boy who does not live with Dotson for reasons unrelated to this matter and two daughters who are 15 and 13 years of age.  Upon moving to the mobile home, Dotson says one daughter chose to live with her grandmother to avoid sharing a bedroom with her sister.

Dotson has resided at the mobile home from July 2006 to the present.  She consulted Legal Aid at various times after moving from the property.  Dotson visited the property every few days.  In July 2006, the property was vandalized, resulting in

various damage.  Upon visiting the property after the vandalism, she noted an intruder could gain access through an unbolted door.

On August 14, 2006, Millard Ray Adkins, a real estate broker retained by Wells Fargo, visited the property and took numerous photographs.  At the time, the property lacked both electricity and running water.  No furniture was present.  The photographs taken on that date and introduced into evidence leave one with the impression that the property had been abruptly abandoned, leaving behind little of any value in or around the house or the garage.  Upstairs in a well house located some 35 feet from the house was found a mattress as well as some soft goods and clothing strewn about.  On August 22, 2006, Adkins returned to the property and changed the locks.

Dotson periodically visited the property between July through December of 2006.  Among other things, she performed certain repairs and cleaned up debris and damages resulting from the July vandalism incident.  In early November, Dotson began moving some items back into the property.  She changed the locks at this time as well.

On November 9, 2006, Dotson instituted this action in the Circuit Court of Boone County.  Her two-count complaint alleges claims for breach of the duty of good faith and fair

5

dealing and estoppel.  On November 17, 2006, Dotson filed a notice of lis pendens with the county clerk's office.  On November 29, 2006, Adkins encountered Dotson at the property.  After advising her she was not permitted on the property, she informed him the locks had been changed.

On December 13, 2006, Wells Fargo removed this action.  The next day, Adkins returned to change the locks anew.  On that occasion he observed that the following items had been placed in the house, namely, a couch, a chair, a headboard but no bed, and a Christmas tree.  While there, Dotson and her boyfriend arrived.  Adkins told Dotson to remove her personal property.

Presently, the property lacks central heating, an apparent longstanding problem Dotson contends she can easily remedy with a $40 sensor.  The lack of central heating, however, forced her during the winter of 2005 to warm the home with a kerosene heater.  The property currently does not have running water as a result of the theft of a pump used for the well.  Dotson contends she can quickly remedy this problem as well.  It is undisputed that mold was found growing on the walls of the property.  Dotson contends she has already remediated the problem.

II.

A.   Governing Standard

Initially, the court discerns no difference between the governing standards for a temporary restraining order or a preliminary injunction. Both are nearly identical forms of interlocutory injunctive relief. See United States Dep't of Labor v. Wolf Run Mining Co., Inc., 452 F.3d 275, 281 n.1 (4th Cir. 2006) ("A preliminary injunction, which may be entered only after notice, is distinguished from a TRO, which may be entered without notice, only by its duration -- a preliminary injunction is of indefinite duration extending during the litigation, while a TRO is limited in duration to 10 days plus one 10-day extension."). The analogy is made necessary by our court of appeals' nearly universal discussion of the governing standard within the context of requests for preliminary injunctions. Temporary restraining orders are typically not reviewed on appeal, thus leaving a bit of a vacuum concerning any separate standard that might be applicable to them as distinguished from that applicable to preliminary injunctions. Virginia v. Tenneco, Inc., 538 F.2d 1026, 1029-30 (4th Cir. 1976) ("The parties agree, as do we, that ordinarily a TRO is not an appealable order within the provisions of 28 U.S.C. §§ 1291 and 1292.").

Having resolved that initial question, the standards governing the entry of a preliminary injunction are well settled:

> In entering a preliminary injunction, a court must consider the following <u>Blackwelder</u> factors: (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest.

<u>Wolf Run</u>, 452 F.3d at 280 (quoting <u>Ciena Corp. v. Jarrard</u>, 203 F.3d 312, 322 (4th Cir. 2000) (citing <u>Blackwelder Furniture Co. v. Seilig Manufacturing Co.</u>, 550 F.2d 189, 193-94 (4th Cir. 1977) (internal quotation marks and citations omitted)).  Plaintiff bears the burden of establishing each of the four prerequisites.  <u>See</u> <u>Direx Israel, Ltd. V. Breakthrough Medical Corp.</u>, 952 F.2d 802, 812 (4th Cir. 1991).

The proper application of the four-part <u>Blackwelder</u> test was explained in <u>In re Microsoft</u>:

> In applying this four-factor test, "[t]he irreparable harm to the plaintiff and the harm to the defendant are the two most important factors."  Emphasis on the balance of these first two factors results in a sliding scale that demands less of a showing of likelihood of success on the merits when the balance of hardships weighs strongly in favor of the plaintiff, and vice versa. ("If, after balancing [the first] two factors, the balance tips decidedly in favor of the plaintiff, a preliminary injunction will be granted if the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation. As the balance tips away from the plaintiff, a stronger showing on the merits is

8

required" (internal citations and quotation marks omitted)).

**In re Microsoft**, 333 F.3d at 526, 527, 531 (noting as well "the condition precedent to the entry of any preliminary injunction -- that it be entered to prevent harm that is both irreparable and immediate . . . ." and that "the lack of evidence sufficient to prove immediate irreparable harm alone requires that the mandatory preliminary injunction entered by . . . [a] district court be vacated . . . .") (citations omitted).

As one might expect, our court of appeals has observed many times that a Rule 65 order is extraordinary and reserved for the most exceptional of situations.  See, e.g., East Tennessee Natural Gas Co. v. Sage,  361 F.3d 808, 828 (4th Cir. 2004) ("The district court issued preliminary injunction orders that mandated affirmative relief (immediate possession) to ETNG.  We have said that '[m]andatory preliminary injunctions do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief.") (quoting Wetzel v. Edwards, 635 F.2d 283, 286 (4th Cir. 1980); In re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 524 (4th Cir. 2003) ("'[P]reliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances.'") (quoting

9

*MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (internal quotation marks omitted)).

The timing of a motion for extraordinary relief is also a critical concern, as noted by our court of appeals in *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989):

> "Although a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (CA2 1985). *See also Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (CA2 1985) ("Lack of diligence, standing alone, may · · · preclude the granting of preliminary injunctive relief, because it goes primarily to the issue of irreparable harm · · ·"). The Associations' delay is thus quite relevant to balancing the parties' potential harms. "Since an application for preliminary injunction is based upon an urgent need for the protection of [a] Plaintiff's rights, a long delay in seeking relief indicates that speedy action is not required." *Skehan v. Bd. of Trustees of Bloomsburg State College*, 353 F. Supp. 542, 543 (M.D. Pa. 1973). *See also Lydo Enterprises v. City of Las Vegas*, 745 F.2d 1211, 1213 (CA9 1984) (finding grant of preliminary injunction to be an abuse of discretion because, *inter alia*, the plaintiff waited four months after notification of adverse zoning decision before bringing suit); and *Brookhaven Housing Coalition v. Kunzig*, 341 F. Supp. 1026 (E.D.N.Y.1972) (noting plaintiffs' year long delay, district court refused to preliminarily enjoin occupation of a new federal office building allegedly constructed in violation of Executive Order No. 11512).

*Id.* at 80. The delay at issue in *Hodel* was six to nine months. *Id.* at 79. The district court denied a motion for preliminary

injunction under those circumstances, a ruling ultimately affirmed by the court of appeals.

B. Analysis

The court first examines the balance of harms. There is no indication in the record, however, that Dotson will suffer irreparable harm if not restored to immediate possession of the property. First, Dotson has acted dilatorily in both challenging the foreclosure and seeking to be restored to possession. More than six months ago, on May 2, 2006, Wells Fargo advised Dotson of her right "to bring a Court action to assert the non-existence of the default or any other defense . . . [she] may have to stop the acceleration of the sale." (Pl.'s ex. 5). If Dotson possessed a valid defense to foreclosure, she could have acted at this early juncture.

On July 7, 2006, Wells Fargo sent Dotson a certified letter giving her notice that the property had been sold and that she was required to leave. Again, Dotson made no apparent challenge to Wells Fargo's action, despite the fact that she was in contact with legal counsel during the summer of 2006. Rather than take any action to challenge Wells Fargo or retain

11

possession, Dotson vacated the property and purchased a new home, one in which she resides presently. It was not until November 9, 2006, that Dotson took legal recourse designed to regain possession of her home. Further militating against a finding of irreparable harm is the fact that Wells Fargo has stipulated that it will not convey the property until this action is resolved.

Although the analysis might properly end with this utter failure by Dotson to discharge her burden at the first step, the impropriety of extraordinary relief is further illustrated by the potential harm to Wells Fargo if Dotson is restored to immediate possession. First, Wells Fargo would become the landlord of a tenant engaged in active litigation with it. Second, and despite Dotson's representations to the contrary, the property is in a somewhat precarious state. It lacks central heating. If Dotson's promised fix does not work, the occupants will resort to the more hazardous use of a kerosene heater. The property lacks running water. If Dotson is unable to repair the problem, the property will rather quickly become uninhabitable. Finally, mold appears in pictures taken of the property in August 2006. Whether Dotson successfully remediated this more complex environmental problem remains to be seen. When one reflects upon the totality of the circumstances, Wells Fargo

is justifiably unnerved about the prospect of being compelled to participate in such a liability-rich arrangement, especially given the involvement of minors.

Meanwhile, Dotson has made adequate provision for herself and her family in another home for the past five months and the immediate future.  Exigent circumstances meriting temporary injunctive relief are absent.

The balance of the harms thus tips so decidedly in favor of Wells Fargo that an examination of the merits would be a meaningless exercise.  The court, accordingly, ORDERS that Dotson's motion for a temporary restraining order be, and it hereby is, DENIED.[1]

---

[1] The court would note that if Dotson ultimately prevails she may be entitled to substantial damages.  First, the property appraised in October 2006 for $33,000 and Dotson seeks declaratory relief that would restore ownership to her.  Second, statutory penalties may amount to as much as $4,000 under the West Virginia Consumer Credit Protection Act in view of WFHMI's rejection of the March payment.  Third, Wells Fargo concedes it is liable for attorney fees if Dotson prevails.  (Not. of Remov. ¶ 11).  When one factors in additional compensatory damages for the intangible, but perhaps very substantial, elements of annoyance and inconvenience, along with punitive damages, Dotson may ultimately secure a very significant sum.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED: December 20, 2006

_____
John T. Copenhaver, Jr.
United States District Judge